**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETS**

| | |
|---|---|
| **JANE DOE (R.B.), an individual,**<br><br>Plaintiff,<br><br>v.<br><br>**GS HOTEL MANAGEMENT LLC d/b/a QUALITY INN & SUITES and d/b/a SUBURBAN EXTENDED STAY, GLOBAL VISION HOTELS, LLC and CHOICE HOTELS INTERNATIONAL, INC.,** | Civil Action No. 1:25-cv-14026 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, R.B., by and through undersigned counsel, hereby files her Complaint against Defendants, GS Hotel Management LLC d/b/a Quality Inn & Suites and d/b/a Suburban Extended Stay, Global Vision Hotel, LLC and Choice Hotels International, Inc., and as grounds therefore states as follows:

**INTRODUCTION**

1. This action for damages is brought by the Plaintiff, R.B., a survivor of sex trafficking, under the Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter the "TVPRA") 18 U.S.C. § 1595(a).[1]

2. R.B. files this civil lawsuit seeking compensation for the harm she suffered when she was forcibly sex-trafficked at the Quality Inn & Suites and Suburban Extended Stay located at

---

[1] A Motion to Proceed Under Pseudonym was filed simultaneously with the filing of this Complaint. Given the nature of the case, R.B. is identified in this Complaint by a fictitious name to prevent public disclosure. Plaintiff's counsel has either previously disclosed full names to defense counsel or will do so immediately upon identification of defense counsel.

50 Oriol Drive, Worcester, MA, (the connected hotels will be together referred to herein as simply the "Quality Inn" or the "Choice Quality Inn") owned, operated, maintained, and controlled by GS Hotel Management LLC ("GS Hotel"), Global Vision Hotel, LLC ("Global Vision") and Choice Hotels International, Inc. ("Choice Hotels") (collectively "the Harboring Defendants" or the "Defendants").

3. Throughout 2016 and 2017, for up to 20 days at a time, R.B., was repeatedly trafficked for sex through coercion, threats and force at the Quality Inn by members of the Kilby Street Gang, including Angelo Gonzalez, Elvin Gonzalez, Robert Nieves, Bradley Alberini, and Taylor Ritter, as well as a man named "Mocha" (collectively the "Traffickers"). Ultimately, her Traffickers came to control every aspect of her life.

4. Sex trafficking is defined in the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age."

5. Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

6. Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use

---

[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

7. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[6] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

8. Recognizing that criminal penalties for pimps and sex buyers (i.e. "Johns") were insufficient, Congress expanded the scope of the TVPRA to provide a civil remedy against those who financially benefit from participation in a venture that they know or should know engages in criminal sex trafficking, specifically including hotels like the Quality Inn that harbored R.B. for sex trafficking purposes.

9. As discussed herein, the Harboring Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims such as R.B. with minimal risk of detection or interruption.

10. The Defendants continued supporting the Traffickers despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the Quality Inn. The Harboring Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

**PARTIES**

---

[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).
[6] 18 U.S.C. §1591(e)(3).

3

11. Plaintiff, R.B., is a natural person who is currently a resident and citizen of Massachusetts. R.B. is a victim of sex trafficking under the TVPRA because she was harbored, transported, or provided for the purpose of being caused, through force, fraud, or coercion, to commit commercial sex acts at the Quality Inn located at 50 Oriol Drive, Worcester, MA in 2016 and 2017.

12. Defendant Choice Hotels International, Inc. ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. Choice is incorporated in Delaware with a principal place of business in Montgomery County, in the State of Maryland. At all relevant times, Choice Hotels International, Inc. owned, supervised, operated, controlled, and/or managed the Quality Inn & Suites and Suburban Extended Stay located at 50 Oriol Drive, Worcester, MA.

13. As discussed in detail below, Choice had day-to-day control over the Quality Inn, which is a Choice brand property, through enforcement of its brand standards, franchise agreement and Choice's ability to unilaterally terminate the franchise agreement with Choice's Quality Inn for non-compliance with its contractual obligations.

14. Defendant GS Hotel Management LLC d/b/a Quality Inn & Suites and d/b/a Suburban Extended Stay ("GS Hotel") is a for-profit corporation, incorporated in Massachusetts and authorized and licensed to do, and is doing business at its principal place of business in Bristol County, in the State of Massachusetts. The registered Managers of GS Hotel are Gautam Sharma and Stephen J. Koch. At all relevant times, GS Hotel owned, operated, controlled, and/or managed the Quality Inn & Suites and Suburban Extended Stay located at 50 Oriol Drive, Worcester, MA.

15. Defendant GS Hotel Management purchased the property at 50 Oriol Drive, Worcester, MA in or around February 2008. The property had two connected hotels, later named the Quality Inn & Suites, and the Suburban Extended Stay, respectively.

16. Defendant Global Vision Hotels LLC ("Global Vision") is a for-profit corporation, incorporated in Massachusetts and authorized and licensed to do, and is doing business at its principal place of business in Bristol County, in the State of Massachusetts. The registered Managers of Global Vision also include Gautam Sharma and Stephen J. Koch. At all relevant times, Global Vision Hotels LLC owned, operated, controlled, and/or managed the Quality Inn located at 50 Oriol Drive, Worcester, MA.

17. According to its own published materials, Global Vision provides full-service hotel management, including operational oversight, staffing, revenue management, accounting, franchise compliance, and supervision of on-site personnel at the hotels it manages. Global Vision served as an active hotel management company responsible for the day-to-day operations of the Quality Inn.

18. GS Hotels and Global Vision are together referred to herein as the "Franchisee Defendants"

19. Choice, together with GS Hotel and Global Vision (collectively the "Harboring Defendants" or the "Defendants"), acted as the joint employer for the staff of the Quality Inn and said Defendants are vicariously liable for the acts of their owners, managers, employees and/or agents.

20. Any and all references to the actions or omissions of the Defendants (either with direct/actual or implied/apparent authority) are alleged to have been taken or omitted in the course and scope of said person's employment or agency and for the benefit of the Defendants, and were the kind of services they were employed to perform; their services

were provided substantially within both the time and space limits of their employment; and they were motivated, at least in part, by a purpose to serve and benefit their employer.

21. At all relevant times, the Quality Inn was a hotel branded by Choice Hotels.

22. The Harboring Defendants, directly participated in a commercial venture that included the harboring and forced sex trafficking of R.B., therefore becoming a perpetrator of her sex trafficking under the TVPRA.

## JURISDICTION AND VENUE

23. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1595 because this action involves a federal question under the TVPRA.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because one or more Defendants reside in this district.

25. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND AND FACTS

I.  **R.B. is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants**

26. For one to two years, between January 2016 and December 2017, R.B. was forced to be a sex slave in a sex trafficking venture between the Harboring Defendants and her Traffickers at the Quality Inn.

27. R.B. was introduced to members of the Kilby Street Gang through a mutual connection in or around 2015, whom R.B. thought was a friend. However, throughout the year 2016, R.B. was forced to engage in commercial sex acts numerous times a day by her Traffickers who physically and mentally abused her. R.B feared for her life.

28. Between 2015 and 2017, the Worcester Police Department and Worcester County District

Attorney's Office conducted a lengthy investigation into members of the Kilby Street Gang, uncovering a coordinated human trafficking and prostitution enterprise operating out of hotels in Worcester, Massachusetts, including the Suburban Extended Stay and Quality Inn at 50 Oriol Drive, Worcester.[7]

29. As a result of that investigation, Angelo Gonzalez, Elvin Gonzalez, Robert Nieves, Bradley Alberini, and Taylor Ritter were criminally charged with human trafficking in or around September 2016.

30. The indictments were supported by extensive Grand Jury testimony presented on multiple dates between May 19, 2016 and July 29, 2016, as well as police reports and witness statements.

31. The Worcester D.A. made public statements about the arrests and investigation during this time which identified the human trafficking charges[8].

32. The trafficked women, including Plaintiff R.B., were required to engage in sexual acts with men in exchange for cash, which the traffickers referred to as "dates."

33. These sex acts primarily occurred inside hotel rooms at the Quality Inn which allowed the Traffickers to operate continuously and with minimal detection.

34. R.B. and other women were not permitted to keep the money earned from sex trafficking; instead, all cash proceeds were turned over to the Traffickers.

35. The Traffickers used narcotics as a primary means of coercion, supplying drugs to the women in exchange for their participation in prostitution.

---

[7] Commonwealth v. Gonzalez, Worcester Superior Court C.R. No. 1685-CR-0339, Appeals Court No. 2019-P-1767
[8] https://worcesterda.com/third-suspect-arraigned-human-trafficking-charges/

36. Angelo Gonzalez and Robert Nieves and others supplied drugs for the operation, with crack cocaine, powder cocaine, and heroin being delivered directly to the hotel rooms.

37. All of the trafficked women, including R.B., were drug dependent, and their Traffickers intentionally reduced drug quantities over time, inducing withdrawal to force the women to perform more sex acts.

38. R.B. and other women were confined to the hotel rooms at times, and were not permitted to leave freely, out of fear of punishment, loss of drugs, or accusations of stealing proceeds.

39. The Quality Inn provided the Traffickers with a stable, controlled environment that enabled the women to be harbored for extended periods, including multi-day and multi-week stays.

40. The trafficking activity inside the hotel rooms was open and ongoing throughout the relevant time period.

41. R.B. encountered the same staff on multiple occasions at the Quality Inn. The staff became familiar with R.B. and her Traffickers due to their repeated presence, extended stays, frequent room changes, and constant stream of male visitors. The Harboring Defendants' staff saw signs of R.B.'s and other trafficked women's abuse perpetrated by their Traffickers, including bruising and physical and verbal abuse occurring in public areas of the Quality Inn property.  On at least one occasion when R.B's Trafficker were checking into the hotel the Trafficker requested a specific room location to better facilitate the venture.

8

42. When most of the Kilby Gang members operating out of the Quality Inn were arrested in late 2016, other perpetrators such as "Mocha" took over the area and continued to traffic Plaintiff R.B. and other women at the Quality Inn throughout 2016 and 2017.

43. By means of a combination of force, fraud, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities including, but not limited to, food, water, transportation, shelter, and clothing, R.B. was held captive and sold for sex at Choice's Quality Inn by her Traffickers.

44. During the time that she was trafficked, R.B.'s Traffickers frequently rented rooms at the Choice Quality Inn because the rooms provided convenient, anonymous, and relatively central locations for "Johns" that would pay to engage in sex with R.B. The relationship between the Traffickers, the Harboring Defendants, and the Quality Inn was continuous and obvious, and the Harboring Defendants knew or should have known about it.

45. At various times between January 2016 and December 2017, R.B. was continuously and unlawfully trafficked at the Quality Inn. R.B.'s Traffickers set the prices for the commercial sex services they required her to provide, controlled the money generated by the services, and used financial dependence to coerce and manipulate R.B. to perform commercial sex services for their financial benefit.

46. Throughout her trafficking, R.B.'s Traffickers connected with "Johns" by posting or causing to be posted advertisements on Craigslist and Backpage advertising for R.B.'s availability for commercial sex. R.B.'s Traffickers posted many of these advertisements and had conversations with "Johns" while connected to Choice's managed Wi-Fi at the Quality Inn.

47. As a part of her repeated exploitation, R.B was forced to stay at the Quality Inn for long

periods at a time without being allowed to leave as she was under constant surveillance, supervision, and control by the Traffickers who determined when she could leave, where she could go, and whether she could communicate with others. The longest time R.B was forced to stay without being allowed to leave was 20 consecutive days.

48. R.B was repeatedly threatened with the safety of her child to coerce her into performing commercial sex acts at the Quality Inn.

49. R.B was under constant surveillance by the Traffickers, who also controlled if and when R.B could communicate with friends and family members.

50. The Traffickers used many different forms of punishment upon R.B to exert control over her. Some of these punishments include: not allowing R.B to leave, taking away R.B's phone to stop her from communicating with people outside of the hotel, physical and emotional abuse, and forcing R.B into a state of withdrawal.

51. R.B. was forced to have sex with multiple "Johns" every day that she was trafficked at the Quality Inn. Every time she stayed at the hotel, a minimum of five "Johns" came through the hotel to purchase sex.

52. R.B was sexually assaulted hundreds of times as a part of her sexual servitude while at the Quality Inn.

53. There were obvious signs that R.B. was being trafficked at the Quality Inn such that the Harboring Defendants knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

54. R.B.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry (discussed further herein). These effects were obvious and apparent to the staff and management of the Quality Inn including effects

on R.B.'s appearance, demeanor, movements throughout the hotel, and her interactions with her Traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that R.B. was being continually subjected to coercion, control, and exploitation.

55. On multiple occasions, R.B. was subjected to verbal and physical abuse. The loud abusive, destructive noise was never investigated by hotel staff and law enforcement was never notified.

56. The Harboring Defendants maintained and had access to security camera footage documenting the constant stream of buyers from cameras placed throughout the hotel and would have seen the trafficking of R.B. if it had followed any reasonable measure to ensure guest safety at the Quality Inn.

57. The Harboring Defendants further maintained reservation systems, guest-complaint databases, and Wi-Fi records that documented unusually high foot traffic, short-term male visitors, and repeated disturbances associated with R.B.'s trafficking. Despite access to this information, Defendants took no corrective action and continued profiting from the venture.

## II. The Hotel Industry's Role in Sex Trafficking and the Harboring Defendants' Knowledge of the Problem

58. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Harboring Defendants knew or should have known regarding the forced sex-trafficking of R.B. at the harboring hotel.

59. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] This is no accident. For years, sex traffickers have been able to reap enormous

---

[9] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-

profits with "little risk when attempting to operate within hotels."[10] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[11] Hotels have been found to account for over 90 percent of commercial sexual exploitation of children.[12]

60. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the Harboring Defendants, on best practices for identifying and responding to forced sex trafficking.[13]

61. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[13]

62. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which the Harboring Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not

---

usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[10] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[11] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[12] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[13] *See*, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

limited to:

   a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

   b. Individuals show signs of physical abuse, restraint, and/or confinement;

   c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

   d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

   e. Individuals lack freedom of movement or are constantly monitored;

   f. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

   g. Individuals have few or no personal items—such as no luggage or other bags;

   h. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

   i. A group of girls appears to be traveling with an older female or male;

   j. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

   k. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, Heroin, and Marijuana;

   l. Possession of bulk sexual paraphernalia such as condoms or lubricant;

   m. Possession or use of multiple cell phones;

   n. Paying nightly for extended stays with cash;

   o. Possession or use of large amounts of cash or pre-paid cards.

   p. Individuals avoid eye contact and interaction with others; and

   q. Individuals have no control over or possession of money or ID;

63. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have

been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[14] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

64. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment, having received training and guidance on this. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels, such as in involvement of a "pimp," were in fact signs of sex trafficking.

65. The Harboring Defendants were aware or should have been aware of these signs of forced sex trafficking when operating and managing the Quality Inn, when enacting and enforcing policies and procedures applicable to that hotel, when training, educating, and supervising the staff of said hotel, and when dealing with Plaintiff and her Traffickers.

66. Given the prevalence of forced sex trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to sex trafficking, it is clear that the decision of a hotel chain, such as Choice here, to continue generating revenue from sex traffickers without taking reasonable steps to identify and prevent sex trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

67. This is especially true given that there were well-established practices for hotels to prevent the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking

---

[14] *E.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

("ECPAT") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments or renting by the hour; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

68. Choice is a signatory of the Code since 2015 and thereby has promised to adopt policies to combat trafficking.[15] Yet, Choice has failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

69. Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards, policies, and procedures for implementation, mandates, and operations, but also enforced them.

70. Choice has made a public commitment to combat human trafficking, and thus, is aware that trafficking is a common problem in the hospitality industry.

---

[15] *See U.S. Members of the Code,* ECPAT, https://www.wearepact.org/code

71. At all relevant times, Choice adopted a centralized approach to trafficking-related issues at all Choice branded properties, including the Quality Inn. This included maintaining centralized policies on detecting and response to trafficking, exercising centralized control over training related to sex trafficking, adopting centralized practices for reporting, and centralized monitoring and assessment of anti-trafficking efforts. Choice also acted on behalf of all Choice properties when communicating and partnering with external entities dedicated to eradicating sex trafficking in the hotel industry

72. Unfortunately for R.B., the Harboring Defendants' promises have proven empty. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like R.B.

## III. Sex Trafficking has Long Been Prevalent at Choice Hotels, and This was Well Known by Choice

73. The use of Choice hotels, including Quality Inn properties, for sex trafficking is well known to Choice. Choice has known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back over a decade highlight Defendant's knowledge of such conduct. Choice, knew, or should have known, of the use of Quality Inn branded hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put Choice on notice of the frequent use of Quality Inn hotels including the Subject Quality Inn for commercial sex and other associated illegal activity.

74. Choice monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories and online reviews confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice branded hotels, including:

   a. In 2004, law enforcement charged a woman with running a brothel out of an Econo Lodge near Disneyland after immigrant women reported being smuggled and forced into prostitution, and police conducted a sting operation at the hotel[16].

   b. In 2012, a federal indictment alleged a nationwide sex trafficking ring used Backpage advertising and, on multiple occasions, "hol[ed] up in an Econo Lodge" near Interstate 35 in the Des Moines area[17].

   c. In 2013, police found that a man held a Mississippi teen against her will, forced her to do drugs, and sold her for sex, and that he was holding the victim(s) at the "Quality Inn on Ross Clark Cir."[18]

   d. In 2013, in a sex trafficking case involving a missing 16-year-old advertised online, law enforcement had hotel receipts showing cash payment for a room at a "Quality Inn" in connection with the operation, and evidence tied to Backpage postings.[19]

   e. In 2013, federal charges alleged a trafficking venture where the trafficker posted Backpage ads, collected money after each "date," and, according to the affidavit summarized in the article, drove victims to Dover, Delaware where they worked out of a room at the Sleep Inn & Suites on N. Dupont Highway until shut down by

---

[16] https://www.latimes.com/archives/la-xpm-2004-feb-13-me-sexslave13-story.html
[17] https://apnews.com/article/archive-de22067580494953bc14f6e9cfcca4aa
[18] https://www.wtvm.com/story/23122332/dothan-man/
[19] https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/

police.[20]

    f.  In 2014, Charlotte-Mecklenburg Police arrested individuals on human trafficking charges after officers were called to the Quality Inn on Griffith Street.[21]

75. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice branded hotels. Moreover, Choice is aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

76. Choice monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Quality Inn where R.B. was trafficked.

77. Choice has access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Choice nevertheless does not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers

78. Choice monitors public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

79. Choice also monitors social media for their branded locations.

80. Choice monitors hotel reviews across its branded hotels. Choice actively engaged third party vendors to extract complaints and reviews across the country. One vendor Choice use was Medalia. Medalia gathered data in meaningful reports for Choice. Medalia reported to Choice what customers had said regarding the hotel and broke down a score in relation to

---

[20] https://www.inquirer.com/philly/hp/news_update/Philly_man_faces_charges_of_sex-trafficking_by_force.html?outputType=amp
[21] https://www.wcnc.com/article/news/crime/3-arrested-on-human-trafficking-charges-in-charlotte/275-292839989?utm_source=chatgpt.com

the sentiment in complaints and reviews. Choice and the Franchisee Defendants had access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking. Choice monitored guest complaints for a number of different reasons. Choice did not, however, actively monitor complaints specifically for activity that would identify trafficking. Medalia frequently pulled complaints and reviews from the internet rife with complaints and reviews related to criminal activity, commercial sex, ad trafficking, Choice did nothing with that data when it received it from the Franchisee Defendants.

81. Even though Choice monitored these hotel reviews, news reports, social media, and other public records, Choice failed to implement proper policies and procedures to prevent human trafficking on their properties, while still continuing to profit on the human trafficking that it knew or should have known was occurring on its franchised properties, including the Quality Inn where R.B. was trafficked.

## IV. Sex Trafficking of R.B. at the Quality Inn

### A. The Harboring Defendants had Actual and Constructive Knowledge of Widespread and Ongoing Sex Trafficking at the Quality Inn

82. The Harboring Defendants were specifically aware that sex trafficking was prevalent at the Quality Inn.

83. The Harboring Defendants knew that the Quality Inn was in a high-crime area with a known history of reports of sex trafficking.

84. During the same period R.B. was trafficked, guests publicly complained of rampant drug activity, prostitution, long-term occupants, frequent police presence, and fear of personal safety at the Quality Inn.

19

85. Online reviews of the Subject Quality Inn hotel, which were monitored by Harboring Defendants, establish the nature of the role the subject Quality Inn serves as a venue for sex trafficking. For example:

a. In 2013 TripAdvisor reviews, a guest states, "I travel frequently and am pretty easy-going about accommodations, but this was by far the worst hotel I have ever stayed in. Hallway was disgusting- crumbs/ garbage on the floor and reeked of cigarette smoke. Bathroom was gross- mold all over shower and shower curtain. The person in the next room blasted music from 3-6am and our repeated calls to the front desk went unanswered." Another guest shared, "my wife stepped on a crack pipe in our room. When I took it to the front desk to attempt to address it with the staff, the front desk clerk was nowhere to be found so I turned it over to the two Worcester police officers who coming handle a disturbance upstairs. They promptly said, "this place is ridiculous!"[22]

b. A 2014 Google review states, "We were put into a horrible room… The hallways have an awful odor. The first day we arrived we were informed by an employee of a stabbing that had occurred outside. Have also encountered several heavily drugged people staying at the inn. Avoid this inn at all costs." [23]

c. In 2016 Google reviews, a guest stated, "DO NOT STAY AT THIS HOTEL… In my opinion, management is asleep at the wheel here. Maintenance and room-service staff are clearly not doing their jobs and there is no on-site management to

---

[22] https://www.tripadvisor.com/Hotel_Review-g41952-d89915-Reviews-Quality_Inn_Suites_Worcester-Worcester_Massachusetts.html
[23] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6

do anything about it." Another guest stated, "Overdose in the hallway. Shady activity all around."[24]

d.  In a 2016 TripAdvisor review, a guest publicly reported that "there was some sketchy guy looking me over and up and down…an apparent friend of the front desk person".[25]

e.  In another 2016 TripAdvisor review, a guest complained of "questionable people hang[ing] out there" and described doors banging every few minutes, loud music, and noises like furniture being thrown against the wall.[26]

f.  In a 2017 Google review, a guest stated, "Gross...bugs blood vomit poop drugs and hookers.....dont stay here!!!"[27]

g.  In a 2018 Google review, a woman shared, "Taking all of our belongings with us because we were afraid to leave it in the room with all the shady looking people walking around. It would've been a better night's sleep if we slept in the car. Never again."[28]

h.  In 2019 Google reviews, guest states, "heavy drug use within the hotel. Very sketchy people in and out. One exit has no lock. Tweakers in the hallway." Another guest shared, "How could this place carry a quality inn name. Nothing remotely quality about it. The whole room/place smelled awfully. Very dangerous / unsafe to be even in daylight. Shame on quality inn for putting your name on this place."[29]

---

[24] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6
[25] https://www.tripadvisor.com/Hotel_Review-g41952-d89915-Reviews-Quality_Inn_Suites_Worcester-Worcester_Massachusetts.html
[26] *https://www.tripadvisor.com/Hotel_Review-g41952-d89915-Reviews-Quality_Inn_Suites_Worcester-Worcester_Massachusetts.html.*
[27] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6
[28] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6
[29] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6

i. In 2020 Google reviews, guests reported pervasive disorder and fear, including that police were present "most of Sunday afternoon handling domestic disturbances," and that guests felt unsafe enough to question staff, asking "What kind of hotel is this? Am I safe staying here". The guests also stated, "my husband and I stayed at your Quality Inn located in Worcester MA and were horrified not only by the service but the cleanliness of our room. Upon arrival, my husband and I were harassed by people in the lobby "waiting for cops to arrive". [30]

j. In a 2022 Google review, a female guest reported that the front desk directed "a trio of females" to walk unescorted to a third-floor room "almost as if on parade for the men that lived there".[31]

86. A population of traffickers, including R.B.'s Traffickers and other sex traffickers, had routinely used the Quality Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents.

87. At the Quality Inn, traffickers, including R.B.'s Traffickers, operated with little regard for concealment, due to an implicit understanding between the Traffickers and Defendants. This understanding enabled the Traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

88. There were other victims being trafficked at the Quality Inn at the same time as R.B. and there were obvious signs these victims were being trafficked. R.B. can specifically recall several other women who were being trafficked by her same Traffickers at the Quality Inn, several of whom were also identified in the criminal matter.

89. The conduct of the Harboring Defendants facilitated trafficking of a number of victims by

---

[30] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6
[31] https://www.google.com/travel/hotels/s/ir7QDrn2PN7mtLCy6

a population consisting of multiple traffickers at the Quality Inn. The Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

90. There were multiple trafficking victims exploited at the Quality Inn prior to R.B.'s trafficking who exhibited obvious "red flags" of trafficking matching industry-recognized signs. These obvious "red flags" were observed by hotel staff and management, including high volumes of men who were not registered guests in and out of their room at unusual times, requesting clean towels and sheets frequently, signs of abuse, loud yelling and fighting, leaving "DO NOT DISTURB" hanger on the room doors constantly, obviously under the influence of drugs, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided the Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

91. All knowledge from the staff at the Quality Inn is imputed to Defendants, who knew about this widespread and ongoing trafficking at the Quality Inn, including the trafficking of R.B., through the direct observations of hotel staff, especially front desk staff and cleaning staff, and including management-level staff.

92. In addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, the Franchisee Defendants knew or should have known about the widespread trafficking at the Quality Inn based on non-public

sources of information including but not limited to:

    a.  surveillance of the property;

    b.  internal investigations;

    c.  customer complaints;

    d.  monitoring of customer feedback;

    e.  information received from law enforcement; and

    f.  other sources of non-public information available to the Harboring Defendants

93. The Franchisee Defendants knew about or were willfully blind to the ongoing trafficking at the Quality Inn.

94. At all material times, Choice had robust reporting requirements in place for its hotels, including the Franchisee Defendants.

95. Choice required the Franchisee Defendants to report all suspected instances of crime, including sex trafficking, at the Quality Inn.

96. Choice regularly received reports from the Franchisee Defendants and others related to suspected instances of crime, including sex trafficking, at the Quality Inn.

97. Choice required the Franchisee Defendants to allow Choice to regularly inspect the Quality Inn. Upon information and belief, during these inspections Choice observed obvious signs of ongoing criminal activity, including red flags of sex trafficking activity.

98. Choice knew or should have known about the widespread trafficking at the Quality Inn based on:

    a.  The obligation of hotel staff and the Franchisee Defendants to report suspected criminal activity, including sex trafficking, to Choice;

    b.  Choice's regular monitoring of online reviews;

c.  Choice's collection and monitoring of customer surveys and complaints;

d.  Choice's collection and monitoring of data about guests at the Quality Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

e.  Choice's supervision and control over day-to-day operations of the Quality Inn through detailed information it obtained through centralized data systems it required the Franchisee Defendants to use and through which the Franchisee Defendants were obligated to allow Choice to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

f.  Choice's regular inspections of the Quality Inn;

g.  Choice's access to surveillance and security systems;

h.  Information provided to Choice by law enforcement; and

i.  Other sources of information available to Choice.

99. Choice discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the Quality Inn. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events.

100. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the Quality Inn reported this to Choice or would have if Choice did not fail to implement reasonable policies and procedures it says it promulgated.

101. In addition, Choice had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

102. Under Choice's protocols, which on their face required hotel staff to report suspected criminal activity to Choice, hotel staff and management were required to report instances of suspected sex trafficking to Choice prior to R.B.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Quality Inn.

103. Choice observed obvious "red flags" of numerous instances of sex trafficking occurring at the Quality Inn based on their supervision and monitoring of the property.

104. Choice and the Franchisee Defendants had, at minimum, constructive knowledge of the widespread and ongoing trafficking at the Quality Inn—and this trafficking resulted from their failure to exercise ordinary care operating the hotel. Specifically, Choice and the Franchisee Defendants each failed to detect sex trafficking that would have been detectable had they exercised ordinary diligence in response to their knowledge of the problem of sex trafficking in their operations and in response to the obvious red flags of sex trafficking at the Quality Inn.

105. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Choice-branded hotels, and at the Quality Inn, the Harboring Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Quality Inn and to make a reasonable investigation in response to signs of potential sex trafficking. If the Harboring Defendants had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the Quality Inn and that they were benefiting from such

trafficking.

106. Choice knew or should have known that this widespread and ongoing trafficking at the Quality Inn was the result of its policies and procedures and that, by continuing its operations in this manner, it would continue to facilitate widespread sex trafficking at this hotel.

**B. The Harboring Defendants Knew or Should have Known R.B. was Being Trafficked at the Quality Inn Given the Clear and Obvious "Red Flags"**

107. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

108. During the period that R.B. was trafficked at the Quality Inn, there were obvious signs, i.e., "red flags" that her Traffickers were engaged in sex trafficking:

    a. Paying for stays in cash;

    b. Other girls were trafficked at the same hotel at the same time as R.B.;

    c. Paying for extended stays on a day-by-day basis;

    d. Obvious signs of illegal drug use;

    e. Frequent requests for linen changes;

    f. Even though R.B. and her Traffickers would stay for multiple days at a time, housekeeping was kept away by using the "DO NOT DISTURB" door hanger;

    g. Unusually large number of used condoms in the trash;

    h. Unusually heavy foot traffic in and out of R.B.'s room involving men who were not hotel guests. These men entered at left at unusual hours and were present at the hotel for brief periods of time;

    i. Visible signs of prior and private physical abuse;

j. Unusually large number of male visitors coming in and out of the room;

k. Loud noises of abuse or other emergency audible to staff or other rooms;

l. The Traffickers were often present with R.B. at check in and would linger around the hotel or in the parking lot; and

m. Other obvious signs of trafficking consistent with the modus operandi of her Traffickers and which included well known "red flags" for trafficking in a hotel.

109. These red flags, as well as those established by other organizations as stated in this Complaint, were open and obvious to anyone working at the Quality Inn (and apparently to many other guests who visited the hotel).

110. At all relevant times it was well known in the hotel industry that these specific "red flags" associated with R.B.'s trafficking at the Quality Inn were common indicators of sex trafficking. The Harboring Defendants had been trained and educated about this, and therefore, knew that such signs were highly suggestive of sex trafficking.

111. Every time R.B. interacted with the Quality Inn's staff, it was readily apparent that R.B. was under the control of her Traffickers.

112. R.B.'s Traffickers followed a repetitive and routine procedure during stays at the Quality Inn and Defendants knew or should have known of R.B.'s trafficking because of a variety of factors detailed herein.

113. Additionally, Choice repeatedly collected data on R.B. her Traffickers, and her "Johns" from her many stays at Choice's hotel, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data.

114. Knowledge of R.B.'s trafficking is imputed to Choice because the Franchisee Defendants

and the hotel staff were the Choice's agents and subagents.

115. Given the obvious signs of R.B.'s trafficking, the Franchisee Defendants and the hotel staff were required to report suspicion of R.B.'s trafficking to Choice.

116. Choice knew or had reason to know about R.B.'s trafficking based on the numerous tools that it used to supervise the hotel.

117. The Harboring Defendants are charged with constructive knowledge of R.B.'s trafficking at the Quality Inn because, had they exercised ordinary diligence, they would have detected this trafficking. This trafficking was known or (with the exercise of reasonable diligence) knowable to the Harboring Defendants. Had the Harboring Defendants followed reasonable industry practices, R.B.'s trafficking would have been detected.

118. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Choice hotels, and at the Quality Inn specifically, the Harboring Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If Defendants had used reasonable prudence, they would have been aware that they were benefiting from R.B.'s trafficking.

### C.  The Franchisee Defendants Facilitated the Sex Trafficking of R.B.

119. The Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the Quality Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because the Franchisee Defendants ratified these acts and omissions, and because the Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Franchisee Defendants, of human

trafficking at the Quality Inn.

120. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Quality Inn, the Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including R.B.

121. The Franchisee Defendants knew or were willfully blind to the fact that R.B. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them with a venue in the form of hotel rooms and related services, to facilitate R.B.'s sexual exploitation.

122. The Franchisee Defendants also facilitated widespread trafficking at the Quality Inn, including the trafficking of R.B. in ways including:

   a. Developing relationships with traffickers and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b. Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation;

   c. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   d. Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   e. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or

30

interference by the hotel staff;

f.  Continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of R.B. and other victims;

g.  Hotel management and/or staff knew R.B. and her Traffickers as regulars and accommodated specific requests made by her Traffickers, including allowing them to have any room they wanted, catering to their needs; and

h.  Failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site.

123. The Franchisee Defendants did not merely rent rooms to unknown guests. They repeatedly rented rooms to known traffickers and their victims, facilitated extended stays under false or third-party names, permitted cash and prepaid-card transactions, ignored repeated disturbances and guest complaints, and continued providing Wi-Fi, housekeeping, and security access that enabled the trafficking venture to operate openly and continuously.

124. The Franchisee Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including R.B.

125. The Franchisee Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

126. Policies purportedly enacted and enforced by Choice to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Quality Inn by the Harboring Defendants, thereby enabling R.B.'s Traffickers to continue the trafficking venture at the Quality Inn. Had Choice enforced the policies and procedures they enacted

31

to prevent trafficking from occurring within their Quality Inn branded hotels after observing an obvious sign of trafficking as described above, R.B.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Quality Inn. Furthermore, had the Franchisee Defendants properly followed the franchise policies enacted by Choice to identify and prevent trafficking from occurring at Quality Inn branded hotels as described above, R.B.'s trafficking would have been identified and reported, which would have prevented her continued trafficking at the Quality Inn.

### D. Choice's Control Over Their Brand Hotels Facilitated the Sex Trafficking of R.B.

127. It is a standard practice in the hospitality industry, followed by Choice, for Parent Hotel Corporations to set exacting brand quality standards.

128. Choice provides its branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. Through Choice's intellectual property licensed to franchisees, Choice's brand names gives their branded properties name recognition. No provision of the Lanham Act provides Choice with protection from its duties to comply with the TVPRA.

129. As a part of the franchise agreement and the licensing of Choice's intellectual property, Choice controls nearly every single aspect of their franchisees, in order to, in part, maintain that brand recognition. This is done not only through the implementation and enforcement of operating procedures and policies, but also through immediate, direct control and/or management given to Choice over several aspects of their franchised hotels' day-to-day operations.

130. As a part of its franchise agreements, Choice reserves the right to unilaterally terminate

the franchise agreement should the franchisee demonstrate non-compliance with these procedures, policies, and direct control and/or management sections of the franchise agreements. The termination of the franchise agreement leads to shutting down of that brand hotel.

131. Therefore, Choice controls, manages, and/or operates the brand hotels through enforcement of its own defined policies and procedures standards. But more than that, Choice's franchise agreements gives Choice direct management over several significant aspects of the brand hotels' day-to-day operations. Non-compliance with these forms of control and/or management leads to termination and the subsequent shutting down of the business.

132. Choice exercised day-to-day control over the Quality Inn through centralized corporate systems it requires franchisees to use to engage in business, training, policies, and brand standards. Choice implemented control over the Quality Inn as either a direct subsidiary or under the terms of its franchise agreements.

133. Choice did not just profit from human trafficking in a tangential way by unknowingly selling services and/or goods to human traffickers. Rather, Choice knowingly, with actual and/or constructive knowledge, rented hotel rooms to sex traffickers and earned revenue.

134. As a part of their franchise agreements, Choice directly controls the hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are controlled by Choice. The Franchisee Defendants were prohibited from using any other reservation platform. Choice oversees booking and

reservation trends, including the branded hotel where Plaintiff was trafficked.[32]

135. As a part of its franchise agreements, Choice directly controls the marketing of its branded hotels, to the point that its branded hotels cannot even put up a road sign without Choice's permission.

136. Choice exercises significant control over their brand hotels, down to managing the size, materials, and brands used in their brand hotels' architecture, infrastructure, utilities, and amenities. Choice requires their franchisees to comply with these brand standards or otherwise face termination, as the agreements (including at the Quality Inn) grant Choice the unilateral right to terminate franchise agreements.

137. Choice requires its branded hotel properties to use a property management system, which is linked to Choice's corporate network and data center, for, among other things, receiving reservations and processing credit card transactions.

138. Per the relevant franchise agreements,[33] Choice enforces its brand standards by means of periodic inspections of its brand hotel locations ensuring compliance with those brand standards.

139. Choice's brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

140. Choice also exercises significant control over sex trafficking through the employment decisions of their hotel locations, including but not limited to their enforcement of brand

---

[32] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[33] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs /.

standards (which are employees are bound by). Choice's policies, procedures, and standards include (but are not limited to) the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay.

141. Choice sets the essential terms and conditions of employment, including hiring, training, retention, advancement, and setting rates of pay. Specifically, Choice creates and promulgate policies relating to training employees to recognize and respond to human trafficking, and Choice determines whether such training shall be mandatory.

142. Choice requires its franchised hotel employees to attend training sessions to ensure compliance with brand standards.

143. Choice regularly communicates with the managers and employees of its franchised hotel locations, often issuing directives to ensure brand quality compliance.

144. Under federal labor law regulations, Choice is considered a joint employer of the employees at the Choice Quality Inn.

145. As a result of the relationship between Defendants and their branded properties, including at the Quality Inn, Choice jointly controlled the terms and conditions for staff with the Franchisee Defendants, making Defendants joint employers. The factors supporting that the Harboring Defendants are joint employers include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Choice's right to terminate franchise agreements with their branded properties for failure to comply with these requirements. Therefore, Choice retained control, the mode and manner of work contracted for, making them responsible for the acts and omissions of staff and branded properties.

146. Choice regularly controls, manages, and/or monitors revenue and cash flow data at its

franchised locations as a part of their franchise agreements obtained through room rentals and hotel amenities such as food services.

147. Choice supplies food, utensils, branded supplies, branded merchandise, and other products to its franchised locations as a part of its franchise agreements. Choice monitors customer complaints and reviews, often taking steps at its franchised locations to remedy these complaints and reviews to maintain Choice's brand quality recognition.

148. Choice employees will often visit franchised hotel locations within the scope of their employment to advance brand quality control.

149. Despite their knowledge that few, if any, employees at their hotel locations actually receive human trafficking training if the same are not mandated, Choice failed to mandate such training on any significant scale or at the Quality Inn where Plaintiff was trafficked.

150. Choice requires its hotel locations to pay approximately 10% of gross revenue back to Choice for the privilege of using Choice's names and following their brand standards.

151. Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Requiring the branded locations to use Choice's property management system;

    b.  Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

    c.  Requiring branded locations to keep audit reports and other records;

    d.  Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

    e.  Providing marketing requirements and standardized marketing services for the branded locations;

f.  Regulating all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h.  Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i.  Providing training and orientation materials for branded property staff;

j.  Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from making substantial changes to the branded property without Choice's permission;

k.  Regulating the rates for room rentals; and

l.  Insurance coverage requirements.

152. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[34]

153. Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[35]

---

[34] *See, e.g., Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). *id.* ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[35] *Id.*

154. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[36]

155. Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[37]

156. Through its national sales team, Choice controls the credit processing system and centralized direct billing at its brand hotels, including the Quality Inn.

157. Choice also manages and/or controls their franchised locations' Wi-Fi, collecting customer Wi-Fi data Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for marketing and profit optimization, as well as guest safety reasons.[38]

158. Choice requires its hotels to carry Wi-Fi internet access with certain Cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

159. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.

160. Choice requires branded properties to comply with its own corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance

---

[36] *The Power of Choice Hotels*, CHOICE, https://www.choicehotelsdevelopment.com/about-choice-hotels/why-choice

[37] *Choice Hotels' News*, CHOICE, https://media.choicehotels.com/2018-01-23-Choice-Hotels-Introduces-Lodging-Industrys-First-Major-Central-Reservation-System-In-30-Years

[38] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

with the law.[39]

161. Choice directly participated in and retained control over specific aspects of the operation of the Quality Inn related to trafficking by:

    a.   directing, assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to Choice;

    b.   directing, assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

    c.   assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    d.   establishing systems for guests to report criminal activity and hotel security issues to franchisor;

    e.   retaining control over the security of the Quality Inn through various means including placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Quality Inn;

    f.   retaining control over property-specific data and customer data, including names, payment information, reservation history, browsing data, and other details associated with their stay, from the Quality Inn —which they obtained by controlling the means and methods by which the Franchisee Defendants recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the

---

[39] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

ongoing trafficking that was occurring at the Quality Inn during the time Plaintiff was trafficked there;

g.   mandating the specific tools and systems that the Franchisee Defendants must use to provide Wi-Fi/internet access to guests;

h.   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

162. Despite having actual or constructive knowledge of the ongoing sex trafficking at the Quality Inn, Choice continued participating in a venture at that hotel, with the Franchisee Defendants and hotel staff, in a way that Choice knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a.   Choice failed to mandate training employees and managers on how to spot the signs of human trafficking and sexual exploitation.

b.   Choice implicitly condoned and endorsed its staff's repeated decisions not to report or respond to trafficking appropriately.

c.   Choice continued to implement and rely on policies, protocols, and practices that had been shown to lead to widespread trafficking at the Quality Inn.

d.   Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Quality Inn, Choice declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at Choice properties.

e.   Choice attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

f.   Choice allowed traffickers to reserve rooms using cash, which provided relative

40

anonymity and non-traceability.

g.  Choice adopted and required their staff to adopt check-in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

h.  Choice continued to allow the Quality Inn to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy its brand affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

i.  Choice provided traffickers with access to internet services that Choice knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

j.  Choice failed to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

k.  Choice Failed to exercise the same degree of control over systems related to Human Trafficking that it did over systems governing other parts of operations and safety. Instead, it ignored intentionally decided not to address the sex trafficking epidemic occurring in Choice hotels, thereby failing to utilize its power as a parent company to hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties

163. In sum, Choice had unfettered control and oversight over its franchised locations, including the Quality Inn.

164. If Choice had exercised reasonable diligence when operating the Choice properties and in the areas where it retained control, Choice would have prevented the Choice properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of R.B. Instead, Choice engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of R.B.

165. Choice should have known about R.B.'s trafficking because it retained control over the training of the staff of the Quality Inn regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Choice had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of R.B. at the Quality Inn. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to Choice.

166. Choice knew or should have known about R.B.'s trafficking because it also retained control over the response of Choice hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, Choice facilitated sex trafficking, including the sex trafficking of R.B. in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to Choice.

167. Choice also knew or should have known about R.B.'s trafficking because it retained the control to adopt and enforce policies on sex trafficking for their properties, including the Quality Inn, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Quality Inn. Choice allowed

traffickers to access rooms for the purpose of harboring their victims, including R.B.. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to Choice.

168. Choice also knew or should have known about R.B.'s trafficking because it retained control over the security of the Quality Inn through various means including placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Quality Inn. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If Choice had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to Choice.

169. R.B. exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if Choice had used reasonable diligence in the aspects of hotel operations over which they retained control.

170. Moreover, R.B.'s Traffickers were able to operate without interference and without making significant effort at a concealment during repeated visits to the Quality Inn over an extended period because Choice adopted policies and practices that insulated R.B.'s Traffickers from significant risk of detection or disruption.

171. Choice' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including R.B.

172. Choice knew that sex trafficking causes immeasurable harm to victims and, nonetheless,

knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

173. Rather than implementing forms of quality control, policies, procedures, or terminating the franchisee location per their contractual right to do so, Choice continued to rent rooms to these traffickers (including the rooms used to sexually exploit R.B.) and thereby to earn substantial revenue from human trafficking occurring at the Quality Inn, profiting from human trafficking occurring at that location.

**V.  The Harboring Defendants Benefitted From Ventures at the Quality Inn**

174. Each of the Harboring Defendants knowingly received benefits from participating in a venture that facilitated trafficking, including R.B.'s trafficking, at the Quality Inn. Each Defendant directly benefited from facilitating trafficking at the Quality Inn. Each Defendant received monetary payment as the result of the rental of rooms at the Quality Inn, including the rooms where R.B. was being trafficked.

175. The Harboring Defendants profited from every stay by every patron at the Quality Inn, both from room rentals and from other hotel services.

176. Choice generates substantial income from operations of hotels such as the Quality Inn. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, Choice received a share of the profits from room rentals collected by the Franchisee Defendants at the Quality Inn. Choice also profits from reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees. The fees generated by Choice are primarily based on gross room rentals; therefore, Choice's profits increase with each room rental to traffickers, including R.B.'s Traffickers.

177. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by

44

keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Quality Inn specifically.

178. In ways described more fully above, the Harboring Defendants knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship with sex traffickers at the Franchisee Defendant hotel.

179. The Harboring Defendants formed this continuous business relationship with the traffickers at the Quality Inn by continuing to rent rooms to traffickers (including R.B.'s Traffickers) after the Harboring Defendants knew or should have known that the rooms were being used for unlawful trafficking.

180. This implicit understanding developed because sex traffickers, including R.B.'s sex Traffickers, frequently used the Quality Inn for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Harboring Defendants that created a favorable environment for sex trafficking to flourish.

181. The Harboring Defendants participated in this venture by acting jointly to rent rooms to traffickers as further described throughout this pleading. The Franchisee Defendants provided "boots on the ground" for reservations, and Choice directly participated in renting rooms to guests, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this pleading. Each Defendant participated in the venture by continuing to rent rooms to traffickers after they knew or should have known that hotel rooms were being used for unlawful trafficking.

182. Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation

with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced as set forth immediately below, among other things:

    a.   These Traffickers (and others) were familiar to and friendly with the staff at the Quality Inn;

    b.   These Traffickers (and others) took few or no steps to conceal their activities from the staff at the Quality Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff

    c.   Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties;

    d.   Defendants allowed traffickers to check in without showing identification;

    e.   Defendants allowed "Johns" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking; and

    f.   Defendants provided additional services to traffickers (including R.B.'s Traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

183. The Traffickers operating at the Quality Inn as part of this venture violated 18 U.S.C. §1591 as to victims trafficked at the hotel, including R.B.

184. R.B.'s trafficking at the Quality Inn was a result of each Defendant's participation in this venture with one another and with the criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from R.B.'s trafficking at the Quality Inn.

185. Defendants were jointly responsible for customer safety and, specifically, prevention of human trafficking at the Quality Inn. Choice retained control over, and thus had a duty with respect to, customer safety at the Quality Inn generally and specifically regarding detection of and response to human trafficking at the Quality Inn.

186. This venture violated the TVRPA through the widespread sex trafficking at the Quality Inn, including the trafficking of R.B., and through the conduct of the Franchisee Defendants which violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

187. Despite actual or constructive knowledge that this venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Choice participated in the venture by continuing to associate with the Franchisee Defendants to operate the Quality Inn in a way that Choice knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of R.B. Instead, Choice continued providing the Franchisee Defendants with operational support, use of its trademarks, marketing services, and other resources to operate the Quality Inn in a way that Choice knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.   The Franchisee Defendants Operated as Choice's Actual Agents

188. In addition to Choice's direct involvement in the venture through the means outlined above, Choice participated in the venture through the acts and omissions of the Franchisee Defendants, its agents, and the hotel staff, its subagents for the purpose of operating the Quality Inn.

189. As described above in Section IV(D), Choice exercised an ongoing and systemic right of

control over the Franchisee Defendants regarding the operation of the Quality Inn.

190. At all relevant times, the Franchisee Defendants were subject to and required to comply with detailed written policies and manuals and other formal and informal protocols, directives, mandates, and expectations imposed by Choice. These standards, protocols, and requirements:

    a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools the Franchisee Defendants used at the Quality Inn;

    b.  regulated virtually all aspects of hotel operations, including but not limited to identification, advertising, front office procedures, cleaning and inspection service for guest rooms and public areas, minimum guest room standards, food purchasing and preparation standards, requirements for minimum supplies of "brand name" goods, staff procedures and standards for soliciting and booking group meetings, functions and room reservations, accounting, insurance, engineering and maintenance, and numerous other details of operation.

    c.  dictated the specific manner in which the Franchisee Defendants and hotel staff must carry out most day-to-day functions at the Quality Inn; and

    d.  significantly exceeded what was necessary for Choice to protect its registered trademarks.

191. Choice required the Franchisee Defendants to adhere to strict requirements, as described above in detail in Section IV(D) and also including:

    a.  Choice required use of an online booking platform for the Quality Inn;

    b.  Choice measured performance of the Franchisee Defendants and set standards for

compliance; and

    c. other actions that deprived Franchisee Defendant of independence in the business operations of the Quality Inn.

192. In addition to the ways described above and in Section IV(D), Choice exercised and reserved the right to exercise systemic and pervasive control over day-to-day operation of the Quality Inn in ways including but not limited to the following:

    a. Choice imposed and enforced detailed requirements for all aspects of hotel facilities.

    b. Choice retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

    c. Choice retained the right to inspect the Quality Inn, including through unannounced inspections, and to perform audits. They inspected and audited virtually all aspects of hotel operations, including internal operations and issues related to guest safety.

    d. Choice retained control to require the Quality Inn to make operational changes within a time established by Choice.

    e. Choice monitored day-to-day operations of the Quality Inn through constant monitoring of guest surveys, online reviews, customer complaints, and data from the back-end of the systems it required the Quality Inn to use.

193. Choice specifically retained control over the day-to-day operation of the Franchisee Defendants with regard to aspects of operation of the Quality Inn that caused R.B.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education polices, and procedure regarding human trafficking.

194. Choice regularly advised the Franchisee Defendants on operational changes necessary for

them to remain in compliance with Choice's strict regulations.

195. Choice had the ability to impose fees or fines on the Franchisee Defendants.

196. Furthermore, at all material times, Choice retained an absolute right to cancel its franchise agreement with the Franchisee Defendants if Choice's rules were violated or if the Franchisee Defendants otherwise failed to comply with its contractual obligations.

197. At all relevant times, the Franchisee Defendants acted as agents of Choice when operating the Quality Inn.

198. Choice and the Franchisee Defendants shared control of the terms and conditions of the employment of staff at the Quality Inn and, therefore, Choice and the Franchisee Defendants are joint employers. Choice exercised control over the terms and conditions employment of staff at the Quality Inn by advertising employment opportunities, making or influencing employment decisions, setting employee wages, and adopting standardized rules of operations that govern the day-to-day work of the employees.

## VII. The Harboring Defendants are Jointly and Severally Responsible for the Trafficking of R.B.

199. The Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

200. Operation of the Quality Inn was part of a single unified operation by the Harboring Defendants. The Harboring Defendants acted jointly to own, operate, control, manage, and supervise the Quality Inn. As an integrated enterprise and/or joint venture, the Harboring Defendants are separately and jointly responsible for compliance with all applicable laws.

201. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to R.B.

202. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to R.B. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

### COUNT I: Liability under §1595 (a) of the TVPRA
### R.B. v. All Defendants (direct liability)

203. Plaintiff hereby adopts and re-alleges each and every allegation in the above paragraphs.

204. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

205. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendant knew or should have known was engaged in a violation of the TVPRA.

206. Through acts and omissions more fully described throughout this pleading, each Defendant received a financial benefit from participating in ongoing business relationship with one another and the population of sex traffickers, including R.B.'s Traffickers, operating at the Quality Inn. Each Defendant violated the TVPRA through its participation, as a beneficiary, in said venture as follows:

    a. Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the subject Quality Inn by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Quality Inn

51

engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of R.B.

b. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while R.B.'s Traffickers were able to rent a secure venue to earn profits by trafficking R.B. Each Defendant participated in the venture by continually renting rooms to R.B.'s Traffickers, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of R.B.'s trafficking.

c. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including R.B., in the rooms of the Quality Inn.

d. Each Defendant knew or should have known this venture engaged in violations of the TVPRA.

e. Each member of this venture pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including R.B.'s Traffickers) rented rooms to earn profits by exploiting trafficking victims (including R.B.). Each Defendant received a financial benefit every time a trafficker rented a room.

f. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including R.B.'s trafficking).

g. The Franchisee Defendants knowingly benefited from this venture by generating

revenue directly from operation of the hotel. Choice knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the hotel, which increased every time a room was rented to a trafficker.

h. The Franchisee Defendants participated in this venture through providing "boots on the ground" at the Quality Inn. Choice participated in this venture by (1) continuing the ongoing business relationship despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

### COUNT II: Vicarious Liability for TVPRA violations
### R.B. v. Choice (vicarious liability)

207. The Franchisee Defendants acted as the actual agent of Choice when operating the Quality Inn.

208. In ways further described above, Choice exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by the Franchisee Defendants to operate the Quality Inn.

209. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

210. As a result of the relationship between Choice and the Franchisee Defendants, Choice is vicariously liable for the acts of the Franchisee Defendants, including at the Quality Inn. Factors that support this allegation are that Choice shared profits, standardized employee

training, standardized and strict rules of operations, Choice controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Thus, Choice retained control, or the right to control, the mode and manner of work contracted for.

211. As alleged above, the Franchisee Defendants are directly liable to R.B. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Choice is vicariously liable to R.B. for those same violations.

212. Choice is also vicariously liable for the acts and omissions of the staff at the Quality Inn because Choice, together with the Franchisee Defendants, acts as the joint employer of these employees because Choice and the Franchisee Defendant jointly control the terms and conditions of their employment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendant as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f.    Attorneys' fees and expenses;

g.    The costs of this action;

h.    Pre- and post-judgment interest; and

i.    Any other relief the Court or jury deems appropriate.

**JURY DEMAND**

Plaintiff hereby requests trial by jury on all issues.

> Respectfully Submitted,
> PLAINTIFF,
> By Her Attorneys,
>
> MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
>
> /s/ *Jennifer A. Denker*
>
> _____
> Jennifer A. Denker, Esq., BBO No. 697545
> 100 Cambridge Street, Suite 2101
> Boston, MA 02114
> (617) 523-8300
> jdenker@meehanboyle.com

DATED: December 31, 2025

**CERTIFICATE OF SERVICE**

I, Jennifer A. Denker, hereby certify that on this 31st day of December, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of this electronic filing to all parties and or counsel of record in this action.

> /s/ *Jennifer A. Denker*
>
> _____
> Jennifer A. Denker, Esq.